ST. CLOUD NATIONAL BANK AND TRUST CO., as Special Conservator of Dawn Lintgen, Appellant,

v.

WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY, Respondent.

No. CX–89–1491.

Court of Appeals of Minnesota.

Feb. 6, 1990.

Gerald W. Von Korff, Rinke–Noonan, St. Cloud, for appellant.

Michael D. LaFountaine, Quinlivan, Sherwood, Spellacy & Tarvestad, P.A., St. Cloud, for respondent.

Considered and decided by PARKER, P.J., and FORSBERG and NORTON, JJ.

## OPINION

PARKER, Judge.

Appellant St. Cloud National Bank and Trust Company is the conservator for Dawn Lintgen, beneficiary of a life insurance policy issued by respondent Woodmen of the World Life Insurance Society (Woodmen). The conservator appeals from a judgment denying coverage under the policy. It contends that the trial court applied an incorrect standard in determining whether Woodmen was bound by erroneous answers concerning the insured's medical history which were made on his application for life insurance and on the report of the nurse examiner. We reverse.

## FACTS

On March 10, 1984, Richard Clement met with Lawrence Lintgen and took his application for a $60,000 life insurance policy with Woodmen. Clement, an agent for Woodmen, asked Lintgen a list of medical history questions and transcribed his answers onto the application; Lintgen then signed it. At the time he took the application, Clement knew that several of the answers were incorrect.

Lintgen had been hospitalized in 1983 for a "depressive reaction" to the death of his son, and during 1984 he was in continuing outpatient treatment for "severe situational stress" at the Veteran's Administration Medical Center. His medical records indicated that he was taking medication in conjunction with his treatment for stress symptoms and that he had occasionally complained of chest pain. In conjunction with this treatment, he received counseling for excessive and unfounded worries about his health.

The trial court found that Lintgen made the following false statements on his application for insurance:

1. During the past five years have you:

    *　　*　　*　　*　　*　　*

    E. Been under care or treatment in any hospital or similar institution?

    Answer: No

    F. Consulted, been examined or been treated by a physician?

Answer: No

2. Have you had or been told you had:

A. Epilepsy, nervous breakdown or any disease or disorder of the brain or nervous system?

    Answer: No

    *　　*　　*　　*　　*　　*

C. High blood pressure, chest pain, heart murmur or any disease or disorder of the heart or circulatory system?

    Answer: No

3. Do you take medication?

    Answer: No

4. Have you ever received treatment or joined an organization for alcoholism or drug addiction?

    Answer: No

After receiving the application, Woodmen contacted Lintgen for a telephone interview. Lintgen told the caller he had been hospitalized in 1983. He gave the treating physician's name to the interviewer and explained that he was treated for being "upset because of his son's death."

On April 4, 1984, Lintgen was admitted to St. Cloud Hospital and remained there for 20 days. His condition was again diagnosed as a depressive reaction to family problems.

During the same time, Clement spoke to Lintgen's sister, who told him Lintgen was being hospitalized. She also told him that Lintgen had been hospitalized for alcohol treatment in 1976. Clement immediately passed this information on to Woodmen's state manager.

Lintgen was released from the hospital on April 24. On May 9, a nurse gave him a physical examination on behalf of Woodmen and asked Lintgen a list of medical history questions. Woodmen provided the examination forms, paid the nurse $10 and directed him to perform only part of the described examination.

The trial court found that Lintgen made false statements to the examining nurse which caused the following false findings on the nurse's examination report:

7. Do you find evidence of past or present disease or abnormality or is there a history of the following:

A. Epilepsy, nervous breakdown or any disease or disorder of the brain or nervous system?

    Answer: No

   \*    \*    \*    \*    \*    \*

K. Within the past five years any other illness or injury not mentioned above?

    Answer: No

15. Is medication taken?

    Answer: No

On June 1, 1984, Woodmen issued the policy. Woodmen underwriter Ms. Kennedy testified that she based her decision to issue the policy on the answers in Lintgen's application, the record of the telephone interview and the nurse's examination. She did not request to review his medical records and testified that she did not receive any other information on Lintgen's medical history from Clement or the state manager. She said that the most significant omissions concerning his medical history were Lintgen's continuing treatment for depression and stress, stress-related medication and his 1984 hospitalization. Based on the full medical record which she reviewed in preparation for trial, Kennedy stated that she would have denied Lintgen's application for insurance.

Lintgen collapsed at a restaurant on January 1, 1985, and died shortly thereafter. Woodmen refused payment under his 1984 life insurance policy.

## ISSUES

1. Did the trial court err in finding that the erroneous answers given on the application and to the nurse examiner were material misrepresentations which could void the insurance contract?

2. Based on the facts of this case, can this court find as a matter of law that misstatements on the application for insurance and on the examination report were willfully false or intentionally misleading?

## DISCUSSION

The scope of review upon appeal from a judgment is whether the evidence was sufficient to support the trial court's findings and whether the findings support its conclusions of law. *Gruenhagen v. Larson,* 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976). This court must not set aside the trial court's findings of fact unless they are clearly erroneous, with due regard given to the trial court's' opportunity to judge the credibility of witnesses. Minn.R.Civ.P. 52.-01; *Northern States Power Co. v. Lyon Food Products, Inc.,* 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975).

### I

■ The conservator makes a technical argument that the application and the nurse's examination report were not attached to the insurance policy when it was issued to Lintgen. Minn.Stat. § 61A.03, subd. 1(d) (1988), provides that no statement voids a life insurance policy unless it is in writing and is attached to the policy when issued. The conservator did not claim at trial that Lintgen did not receive these documents. It first made this argument in a post-trial memorandum. The trial court concluded that "it did appear that the application had been attached." These items are stapled together; there is evidence in the record from which the trial court could have concluded that the documents were attached. The trial court's finding was not clearly erroneous.

The trial court stated in its memorandum:

> The general rule was stated in *Shaughnessy v. New York Life Insurance Co.,* [163 Minn. 134] 203 N.W. 600 (Minn. 1925). At page 601 the court said, " \* \* \* the case presented is one in which there was an undoubted misrepresentation of a matter which materially affected the risk. When such a misrepresentation is made, it is unimportant whether it was accompanied by an intent to deceive, for, under the statute, a recovery is barred, although no fraud or deception was practiced or intended." Cases cited.

The statute referred to in *Shaughnessy* was a general statutory provision which is no longer applicable to life insurance policies. Minn.Stat. § 60A.08, subd. 9 (1988). In addition, *Shaughnessy* is distinguished because that case involved a medical examination; here there was no comparable examination.

■ Minn.Stat. § 61A.11 (1988) provides the correct standard for determining whether incorrect statements may void a contract for life insurance:

> In any claim upon a policy issued in this state without previous medical examination * * * the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding upon the company, unless willfully false or intentionally misleading.

Woodmen referred Lintgen to a nurse for a "paramedical examination." In a letter to the paramedical organization which supervised the examinations, Woodmen asked for only part of a medical report:

> The Woodmen of the World Life Insurance Society does not require that Part II–Personal History questions to be completed by the examiner. We do, however, ask the paramedic examiner answer Part II medical examination form questions 1–7, 11–13 and questions 15 and 16. * * * No paramedical examinations are acceptable above $150,000, that is $150,001.

This examination expressly excluded questions related to coronary examination.

By Woodmen's own terms, it ordered an examination of Lintgen which was something short of a medical examination. The nurse who examined him checked his pulse and blood pressure, performed a limited urinalysis and asked him a list of medical history questions provided by Woodmen. The nurse was not supervised by a medical doctor, nor was the nurse's report evaluated by one. Thus, Lintgen did not have a medical examination in conjunction with his application for insurance. The statute requires, therefore, that the standard to be met in voiding Lintgen's insurance contract is that his statements must have been willfully false or intentionally misleading. The trial court made no such finding and therefore erred in voiding the contract.

## II

At oral argument Woodmen urged that this court could and should find as a matter of law that the misstatements made on the application and on the paramedical examination report were willfully false or intentionally misleading. We do not believe, on the record submitted, that this court could so hold.

An insured's statements are willfully false and intentionally misleading and may void a life insurance contract if

> at the time of application "facts of which the insured had full knowledge were concealed from the insurer * * * and were of such probative force as in all reasonable probability, if brought to the knowledge of the company, would have precluded the issuance of the policy."

*Howard v. Aid Association for Lutherans*, 272 N.W.2d 910, 913 (Minn.1978) (quoted in *Useldinger v. Old Republic Life Insurance Co.*, 377 N.W.2d 32, 35–36 (Minn.Ct. App.1985), *pet. for rev. denied* (Minn. Jan. 17, 1986)).

There is evidence that Lintgen was confused about his medical condition. He suffered from fears that he had cancer. He had a history of seeking attention by complaining about supposed illnesses. During the time he was applying for this life insurance policy, he was receiving counseling to understand his pattern of seeking medical attention for non-existent problems and to aid him in realizing that he did not have cancer, heart disease or other complained-of illnesses.

■ The medical records describe Lintgen's treatment for "severe situational distress" and "depressive reaction;" they do not apply the terms "nervous breakdown or disease or disorder of the brain or nervous system," and there is no evidence that Lintgen was told he had a breakdown or any disease or disorder of the mind. *Cf. Berthiaume v. Minnesota Mutual Life Insurance Co.*, 388 N.W.2d 15, 18 (Minn.Ct.App.

1986), *pet. for rev. denied* (Minn. July 31, 1986) (willful falsity found where doctor testified that insured was undergoing treatment for high blood pressure and was informed of this condition prior to applying for the disputed life insurance policy).

■ Lintgen represented on the application for life insurance that he had not been hospitalized within the previous few years. Soon after receiving his application for insurance, a Woodmen representative interviewed him by telephone and learned that he had been hospitalized in 1983 for stress related to the death of his son. This information therefore corrected the misstatement on his application concerning past hospitalization.

■ Woodmen agent Clement knew that certain responses on the application were incorrect at the time he took the application. He later learned from Lintgen's sister that he was currently being admitted to the hospital and that he once had undergone treatment for alcoholism. Woodmen argues that an insurance agent's knowledge cannot be imputed to the company; no question of imputation occurs, however, because Clement *in fact* called Woodmen's state manager and conveyed the information to him. If, within the company, this information was not made available to the underwriter, such internal failure is not the responsibility of Lintgen's beneficiary.

We further observe that after learning of the two hospitalizations and Lintgen's prior treatment for alcoholism, the company still did not examine Lintgen's medical records, although he gave the following specific authority to do so:

> I authorize any licensed physician, hospital, clinic or other person who has or may attend me * * * to give to Woodmen of the World Life Insurance Society or its reinsurers any requested information about me.

Lintgen also gave the name of his doctor to Woodmen's telephone interviewer.

Given his confusion about his health, Woodmen's knowledge of his hospitalization and alcohol treatment, and its failure to investigate his medical records, we cannot hold that Lintgen's misstatements during the application process were, as a matter of law, willfully false or intentionally misleading.

## DECISION

The trial court erred in finding that Woodmen properly denied coverage under the 1984 life insurance policy without finding that the insured's statements were willfully false or intentionally misleading. On the record presented, we cannot find as a matter of law that the statements meet this standard.

Reversed.